UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| Everett Galindo GONZALEZ,<br><br>          Plaintiff,<br><br>v.<br><br>Dr. SEDIGHI, et al.,<br><br>          Defendants. | Case No.: 21-cv-00792-AGS-DDL<br><br>**ORDER GRANTING DEFENSE'S SUMMARY-JUDGMENT MOTION (ECF 42)** |
|---|---|

Various medical personnel move for summary judgment on plaintiff inmate's civil-rights claims regarding deliberate indifference to his medical needs.

## BACKGROUND

Plaintiff Everett Gonzalez is an inmate at Richard J. Donovan Correctional Facility. (ECF 7, at 1.) Representing himself, Gonzalez sued three members of the prison's medical staff under 42 U.S.C. § 1983 for providing him inadequate health care in violation of the Eighth Amendment. (*See generally* ECF 7.) Specifically, he claims that Dr. Sedighi improperly: (a) cancelled his gabapentin pain-medication prescription, (b) withdrew a medical order for a bottom bunk, and (c) denied his request for orthopedic shoes. (*See id.* at 9–14.) Similarly, Gonzalez alleges that on the one occasion Nurse Butteris saw him, she withheld necessary pain medication. (*Id.* at 15–16.) And he contends that Chief Medical Officer Glynn improperly supervised the other two. (*Id.* at 23–24.) Defendants move for summary judgment on all claims.

## DISCUSSION

The dispositive issue here is whether there is a genuine dispute of material fact regarding Gonzalez's Eighth Amendment claims of inadequate medical care.

### A. Summary-Judgment Standard

A court may grant summary judgment when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The party seeking

summary judgment bears the initial burden of identifying the portions of the factual record that demonstrate an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it might affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine dispute as to any material fact actually exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party cannot "rest upon the mere allegations or denials of [its] pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." *See Estate of Tucker*, 515 F.3d 1019, 1030 (9th Cir. 2008) (cleaned up).

## B. Eighth Amendment Claims of Inadequate Medical Care

To prevail on an Eighth Amendment claim for inadequate medical care, prisoners must show "deliberate indifference" to their "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This includes "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Balla v. Idaho*, 29 F.4th 1019, 1025 (9th Cir. 2022). No one disputes that Gonzalez's medical needs were objectively serious, so the Court focuses here only on deliberate indifference. It is a "high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Prisoners must demonstrate that the defendant "knew of and disregarded an excessive risk" to their "health and safety." *Dunlap v. IMSI*, No. 22-35253, 2023 WL 48632956, at *1 (9th Cir. Jul. 31, 2023) (quotation marks omitted); *Toguchi*, 391 F.3d at 1057 (same). This "requires more than ordinary lack of due care." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quotation marks omitted). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

Yet a "difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987. To prevail on a claim involving "choices between alternative courses of treatment," a prisoner "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that the doctors "chose this course in conscious disregard of an excessive risk to plaintiff's health." *Gordon v. County of Orange*, 6 F.4th 961, 970 (9th Cir. 2021).

**1. Dr. Sedighi**

Gonzalez alleges that Dr. Sedighi was deliberately indifferent in three main ways, discussed in turn below.

a. *Tapering Gabapentin*

First, Gonzalez faults Dr. Sedighi for ending his gabapentin prescription. Gonzalez contends that Dr. Sedighi "completely ignored" his complaints about his painful back as well as Gonzalez's plea that he "needed to continue his medication of Gabapentin." (ECF 54, at 4.) In addition, once Dr. Sedighi "decided to taper" Gonzalez off gabapentin, Gonzalez insists that Dr. Sedighi "should have substituted it" with another pain medication. (*Id*.) In response, Dr. Sedighi maintains that he had good medical reasons for his decisions and that he ensured appropriate treatment alternatives. (ECF 42, at 25.)

The relevant facts are clear in the record. At their initial visit in February 2020, Dr. Sedighi "continued [Gonzalez's] prescription of Gabapentin," but the doctor also "provided a drug contract to Mr. Gonzalez and explained [he] would discontinue the Gabapentin if [Gonzalez] refused any drug tests." (ECF 42-1, at 23; ECF 42-6, at 28.) A month later, Dr. Sedighi says he "became aware that Mr. Gonzalez refused a urine test on March 16, 2020." (ECF 42-1, at 4.) At their next visit two days later, Dr. Sedighi decided to taper and discontinue the gabapentin prescription. (ECF 42-6, at 35.) Also at that visit,

Dr. Sedighi noted that Gonzalez was "able to perform his activities of daily living, and could ambulate without any assist device." (ECF 42-1, at 4–5.) Dr. Sedighi nonetheless prescribed "nortriptyline for his complaints of chronic pain." (*Id.*)

In addition, Dr. Sedighi has offered uncontradicted expert evidence—from a Dr. Clayton—that bolsters the rationale for discontinuing gabapentin in favor of other pain treatments. According to Dr. Clayton's expert opinion, the "risk[s] associated with narcotic pain management in a patient with known opioid use disorder are significant and potentially life-threatening, including respiratory depression, overdose, and death." (ECF 42-3, at 20.) In particular, gabapentin is "associated with a nearly 60% higher risk of death from overdose when prescribed to patients with opiate use disorder," and thus, in accordance with "CDCR policies and best practices for chronic non-cancer pain management, Dr. Sedighi and other physicians tapered Plaintiff off these medications after the surgeries in favor of medications and treatments that did not pose significant harm to the Plaintiff." (*Id.* at 21–22.) Finally, based on his review of the medical records, Dr. Clayton concluded that "throughout his treatment course Plaintiff was offered not only physical and cognitive behavioral therapy, but also multiple medication options for chronic pain management including nortriptyline, amitriptyline, Depakote, Effexor, ibuprofen, Tylenol, lidocaine patches, diclofenac gel, and capsaicin cream." (*Id.* at 20.) Even when Gonzalez later began having trouble walking in December 2020, Dr. Clayton opined that "the risk of narcotic pain medications outweigh the potential benefits." (*Id.*)

Gonzalez disputes a couple of contextual facts regarding Dr. Sedighi's actions. First, Gonzalez denies refusing a urine test. (ECF 54-2, at 5.) But there is no dispute that prison officials—rightly or wrongly—documented Gonzalez's actions as a refusal, and it was reported that way in the medical records that Dr. Sedighi later reviewed. (*See* ECF 42-6, at 36.) Second, Gonzalez argues that Dr. Sedighi could not have decided in March 2020 to stop his pain medications due to drug-abuse issues, because Gonzalez "did not inform staff of any drug use until April of 2020." (ECF 54, at 12.) Even assuming Dr. Sedighi was unaware of Gonzalez's history of heroin addiction and overdoses, at their first meeting

4

Dr. Sedighi chose to put Gonzalez on a "drug contract" and warned him of the consequences if he "refused any drug tests." (ECF 42-1, at 3.) When Dr. Sedighi later read that Gonzalez had refused such a test—even if that information was inaccurate—he reasonably had concerns about drug-addiction complications.

Where does this leave Gonzalez? To the extent he claims that only gabapentin will treat his chronic pain, his unsupported lay opinion is insufficient as a matter of law to establish a genuine factual dispute. *See Estelle*, 429 U.S. at 93 (stating that the question whether "additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment"); *Toguchi*, 391 F.3d at 1058 (finding arguments that "Seroquel is superior to Triafon and therefore should not have been discontinued" insufficient to establish deliberate indifference); *see also O'Brien v. Saha*, No. 19-CV-1957-JLS-JLB, 2021 WL 960693, at *6 (S.D. Cal. Mar. 15, 2021) (concluding that "no reasonable juror could find that Defendants were deliberately indifferent to Plaintiff's pain in tapering him off morphine and gabapentin and pursuing a variety of other pain treatment options over a period of many months"); *Peacock v. Horowitz,* No. 13-cv-2506-TLN-AC, 2016 WL 3940346, at *7 (E.D. Cal. July 21, 2016) ("While plaintiff is certainly free to refuse specific medications or types of medications, he does not have a right to dictate what medications he will be prescribed.").

Thus, Dr. Sedighi is entitled to summary judgment as to the gabapentin issue.

b. *Bottom-Bunk Chrono*[1]

Next, Gonzalez complains that Dr. Sedighi improperly rescinded a medical order for a bottom-bunk placement, which later led to Gonzalez injuring himself as he tried to get

---

[1] "Chrono" is shorthand for a "comprehensive accommodation chrono, CDCR form 7410," which lists a prisoner's "accommodations due to a medical condition." *Dukes v. Lizaola*, No. C 10-0864 CRB (PR), 2011 WL 13194957, at *1 n.1 (N.D. Cal. July 22, 2011).

onto the top bunk. For his part, Dr. Sedighi contends this switch was a "reasonable medical decision." (ECF 42, at 28.)

According to the medical records, on June 8, 2020, Dr. Sedighi examined Gonzalez, who was "insisting to be removed from [the] lower bunk" and stating that "he feels comfortable to go to [an] upper bunk." (ECF 42-6, at 43.) Dr. Sedighi also noted that Gonzalez was able to perform activities of daily living and "is independent and does not use any assistive device." (*Id.*) As a result, Dr. Sedighi ordered that Gonzalez's CDCR Form 7410 "will be updated and patient will be removed from lower bunk." (ECF 42-6, at 43.) Six months later, on December 8, 2020, Gonzalez "tested positive for the Covid virus" and was therefore moved "to another area of the prison," where he "was placed on a TOP-BUNK at [the] C-yard gym." (ECF 7, at 13.) After four days at this new location, Gonzalez claims he "attempted to get on [his] top bunk," but suffered a "drastic fall" to the floor. (*Id.* at 13–14; ECF 54, at 5.) Gonzalez blames the resulting "significant injury" on Dr. Sedighi for "removing []his chrono of lower bunk." (ECF 54, at 5.)

Of note, Gonzalez disputes Dr. Sedighi's notations in the medical record. According to Gonzalez, Dr. Sedighi "states I requested my bottom bunk chrono be removed, [but] this is erroneous." (ECF 54-2, at 4.) Yet Gonzalez does not elaborate on how or why the statement is erroneous, nor does he expressly dispute telling Dr. Sedighi to remove the lower bunk chrono on June 8, 2020. He complains instead that Dr. Sedighi rescinded his "lower bunk chrono, without informing plaintiff." (ECF 54, at 5.)

Even assuming Gonzalez did not seek to void his bottom-bunk chrono, he has not introduced any corroborating evidence to support his argument that he still needed a lower-bunk placement when Dr. Sedighi cancelled it—let alone that Dr. Sedighi acted with deliberate indifference by doing so. By contrast, Dr. Sedighi swears that during the June 2020 visit, Gonzalez was "ambulatory, had no significant medical complaints, and did not appear in need of [a] bottom bunk chrono." (ECF 42-1, at 5.) Due to the "benign physical exam finding and no use of assistive device per patient," Dr. Sedighi removed the bottom-bunk chrono, and he declared that he "would not have removed" it if he "believed

Mr. Gonzalez's condition required such a chrono." (*Id.*) Gonzalez's lay opinion to the contrary is not enough to raise a triable issue of material fact that Dr. Sedighi was medically indifferent by removing the lower-bunk chrono six months before Gonzalez fell. Dr. Sedighi's motion for summary judgment on that liability theory is granted.

  c. *Denial of Orthopedic Shoes*

  Finally, Gonzalez criticizes Dr. Sedighi for denying his plea for tennis shoes or orthopedic shoes. (ECF 7, at 10.) According to Gonzalez, Dr. Sedighi replied, "[S]o much crying, I am not here to hear you guys whining." (*Id.* at 9.) When Gonzalez asked for wider shoes because of his difficulty walking, Dr. Sedighi purportedly said that "he was not here to give away shoes." (*Id.*)

  In his motion, Dr. Sedighi contends that his "opinion that orthopedic shoes were unnecessary was medically acceptable and within the standards of care." (ECF 42, at 29.) In addition, he offers Dr. Clayton's expert opinion that Gonzalez's complaints of "numbness of the toes in the left foot and intermittent foot swelling" are insufficient to "meet criteria for the prescribing or ordering of orthopedic[] shoes." (ECF 42-3, at 17.) Also, Dr. Clayton notes that two other prison physicians "evaluated and denied Plaintiff's request for orthopedic shoes." (*Id.*)

  In his opposition papers, Gonzalez does not respond to Dr. Sedighi's arguments—or the related evidence—regarding orthopedic footwear. Once again, he relies only on his own lay opinion to the contrary. Thus, the record is devoid of evidence that would create a triable issue of disputed fact regarding a shoe prescription. Dr. Sedighi is therefore entitled to summary judgment on each part of Gonzalez's Eighth Amendment deliberate-indifference claim.

  **2.** *Nurse Butteris*

  Defendant Butteris was the nurse who attended to Gonzalez after his December 12, 2020 fall off the top bunk. Gonzalez claims that she "falsely reported" that he "showed signs of drug behavior" and was deliberately indifferent to his medical needs, particularly by failing "to provide any pain medication, counsel, advi[c]e, or information throughout

the whole ordeal in the emergency room." (ECF 7, at 17; ECF 54, at 17.) Nurse Butteris responds that, as a "Registered Nurse" and not a doctor, she was not allowed to "prescribe any medication to a patient." (ECF 42-2, at 2.) Also, she says that she could not give Gonzalez over-the-counter pain medication, "because his medical history indicated he was allergic to acetaminophen." (*Id*. at 3.) She declares that "she was attentive to Gonzalez's medical needs on December 12, 2020 and acted appropriately." (ECF 42, at 33.)

In his amended complaint, Gonzalez alleges that Nurse Butteris disregarded his acute lower-back pain because she thought he "looked like he was after drugs and she was not going to give Plaintiff drugs." (ECF 7, at 15.) While Gonzalez was lying in a fetal position—with any movement causing excruciating pain—Nurse Butteris told him that due to Covid-pandemic restrictions, a doctor could only be reached by telephone. (*Id*.) She allegedly said: "While you look like you (plaintiff) are showing signs [of] pain[,] there is nothing I can do[.] [Y]ou (plaintiff) are showing signs of opioid drug abuse." (*Id*.) According to Gonzalez, Nurse Butteris told guards to remove him from the emergency ward, with force if necessary. (*Id*.) A guard purportedly responded: "The dude (plaintiff) looks like he's in pain[.] [A]re you sure we [should] take him back[?]" (*Id*.) Gonzalez claims Nurse Butteris told the guard to "get him out of here." (*Id*.)

Butteris tells a somewhat different story. When Gonzalez arrived, she allegedly "reviewed Mr. Gonzalez's medical history," which showed he had "allergies to Tylenol, ib[]uprofen, and other NSAIDs, that Mr. Gonzalez had struggled with substance abuse, and he was tapered off gabapentin." (ECF 42-2, at 2; ECF 42-8, at 23–24.) Nurse Butteris also attests that Gonzalez asked for gabapentin during this examination. (*See* ECF 42-2, at 2.) According to Butteris, after "speaking with Mr. Gonzalez and examining him, I consulted with Dr. Santos" who "ordered a lidocaine patch and capsaicin topical pain relievers to address Mr. Gonzalez's medical complaints." (*Id.*) She also scheduled a "follow up appointment with Dr. Zhang." (*Id.*)

Gonzalez complains that "Butteris sent Plaintiff back to [the] gym with no medication *except* medication Plaintiff had in his possession." (ECF 54, at 15 (emphasis

added).) But he does not rebut her position that she lacked the authority to prescribe the Gonzalez's preferred pain medication nor that Gonzalez's listed allergies prevented her from giving him over-the-counter medications. And Gonzalez does not dispute that Butteris consulted with a physician who determined that Gonzalez should be discharged with a "lidocaine patch" and the topical analgesic "capsaicin" for pain. (*See* ECF 42-7, at 3.)

In short, Gonzalez has failed to point to any evidence in the record that Nurse Butteris was deliberately indifferent to his serious medical needs. "A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Colwell v. Bannister*, 763 F.3d 1060, 1068 (9th Cir. 2014). Gonzalez does not submit any admissible evidence to show that Butteris's actions on the one occasion she treated him rises to the level of deliberate indifference. Defendant Butteris is also entitled to summary judgment.

### 3. *Chief Medical Officer Glynn*

The Court grants defendant Glynn's motion for summary judgment. In his brief, Gonzalez "withdraws suit against Defendant Glynn." (ECF 54, at 25.)

In light of the foregoing rulings, the Court need not address any other defense argument for summary judgment.

### CONCLUSION

The defense's summary-judgment motion is **GRANTED**. The Clerk of Court will enter final judgment in favor of defendants on all claims and close this case.

Dated:  March 18, 2024

Andrew G. Schopler
United States District Judge